# NATIONAL PROHIBITION CASES.

ORIGINAL, AND APPEALS FROM THE DISTRICT COURTS OF THE
UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS,
THE WESTERN DISTRICT OF KENTUCKY, THE DISTRICT
OF NEW JERSEY, THE EASTERN DISTRICT OF WISCONSIN,
AND THE EASTERN DISTRICT OF MISSOURI.

Nos. 29, 30, Original; and Nos. 696, 752, 788, 794, 837.—Argued March 8,
9, 10, 29, 30, 1920.—Decided June 7, 1920.

The adoption by both houses of Congress, each by a two-thirds vote,
of a joint resolution proposing an amendment to the Constitution
sufficiently shows that the proposal was deemed necessary by all
who voted for it. An express declaration that they regarded it as
necessary is not essential. P. 386.

The two-thirds vote in each house which is required in proposing an
amendment is a vote of two-thirds of the members present—assuming
the presence of a quorum—and not a vote of two-thirds of the entire
membership, present and absent. *Id. Missouri Pacific Ry. Co.* v.
*Kansas*, 248 U. S. 276.

The referendum provisions of state constitutions and statutes cannot
be applied, consistently with the Constitution of the United States,
in the ratification or rejection of amendments to it. *Id. Hawke*
v. *Smith, ante*, 221.

The prohibition of the manufacture, sale, transportation, importation
and exportation of intoxicating liquors for beverage purposes, as
embodied in the Eighteenth Amendment, is within the power to
amend reserved by Article V of the Constitution. *Id.*

That Amendment, by lawful proposal and ratification, has become a
part of the Constitution, and must be respected and given effect the
same as other provisions of that instrument. *Id.*

The first section of the Amendment—the one embodying the prohibi-
tion—is operative throughout the entire territorial limits of the
United States, binds all legislative bodies, courts, public officers and
individuals within those limits, and of its own force invalidates every
legislative act—whether by Congress, by a state legislature, or by
a territorial assembly—which authorizes or sanctions what the section
prohibits. *Id.*

350. Statement.

The second section of the Amendment—the one declaring "The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation"—does not enable Congress or the several States to defeat or thwart the prohibition, but only to enforce it by appropriate means. P. 387.

The words "concurrent power" in that section do not mean joint power, or require that legislation thereunder by Congress, to be effective, shall be approved or sanctioned by the several States or any of them; nor do they mean that the power to enforce is divided between Congress and the several States along the lines which separate or distinguish foreign and interstate commerce from intrastate affairs. *Id.*

The power confided to Congress by that section, while not exclusive, is territorially coextensive with the prohibition of the first section, embraces manufacture and other intrastate transactions as well as importation, exportation and interstate traffic, and is in no wise dependent on or affected by action or inaction on the part of the several States or any of them. *Id.*

That power may be exerted against the disposal for beverage purposes of liquors manufactured before the Amendment became effective just as it may be against subsequent manufacture for those purposes. In either case it is a constitutional mandate or prohibition that is being enforced. *Id.*

While there are limits beyond which Congress cannot go in treating beverages as within its power of enforcement, those limits are not transcended by the provision of the National Prohibition Act (Title II, § 1), wherein liquors containing as much as one-half of one per cent. of alcohol by volume and fit for use for beverage purposes are treated as within that power. *Id. Jacob Ruppert v. Caffey*, 251 U. S. 264.

Nos. 29 and 30, Original, bills dismissed; No. 794, reversed; Nos. 696, 752, 788 (264 Fed. Rep. 186), and 837, affirmed.

THE seven cases here given one name for convenient reference involved the validity of the Eighteenth Amendment and of certain general features of the National Prohibition Act designed for its enforcement. They were as follows:

No. 29, Original. *State of Rhode Island* v. *A. Mitchell Palmer, Attorney General,* and *Daniel C. Roper, Commissioner of Internal Revenue*. Bill dismissed.

No. 30, Original. *State of New Jersey* v. *A. Mitchell Palmer, Attorney General,* and *Daniel C. Roper, Commissioner of Internal Revenue.* Bill dismissed.

No. 696. *George C. Dempsey* v. *Thomas J. Boynton, United States Attorney for Massachusetts,* and *Andrew J. Casey, Acting Collector of Internal Revenue for Massachusetts.* Appeal from the District Court of the United States for the District of Massachusetts. Decree refusing injunction affirmed.

No. 752. *Kentucky Distilleries & Warehouse Company* v. *W. V. Gregory, District Attorney for the United States for the Western District of Kentucky,* and *Elwood Hamilton, Collector of Internal Revenue for the Collection District of Kentucky.* Appeal from the District Court of the United States for the Western District of Kentucky. Decree refusing injunction affirmed.

No. 788. *Christian Feigenspan, a corporation,* v. *Joseph L. Bodine, United States Attorney for the District of New Jersey,* and *Charles V. Duffey, Collector of Internal Revenue of the Fifth District of New Jersey.* Appeal from the District Court of the United States for the District of New Jersey. Decree refusing injunction affirmed.

No. 794. *Hiram A. Sawyer, as United States Attorney for the Eastern District of Wisconsin, Burt Williams, as Collector of Internal Revenue of the Second District of Wisconsin,* and *Thomas A. Delaney, as Federal Prohibition Enforcement Director for Wisconsin* v. *Manitowoc Products Company.* Appeal from the District Court of the United States for the Eastern District of Wisconsin. Decree granting injunction reversed.

No. 837. *St. Louis Brewing Association, a corporation,* v. *George H. Moore, Collector of Internal Revenue of the First District of Missouri, Walter L. Hensley, United States Attorney for the Eastern District of Missouri,* and *Frank L. Diggs, Prohibition Agent for the First Internal Revenue District of Missouri.* Appeal from the District Court of

the United States for the Eastern District of Missouri. Decree refusing injunction affirmed.

*Mr. Herbert A. Rice*, Attorney General of Rhode Island, for the plaintiff in No. 29, Original. *Mr. A. A. Capotosto*, Assistant Attorney General, was on the briefs. See *post*, p. 354.

*Mr. Thomas F. McCran*, Attorney General of New Jersey, for the plaintiff in No. 30, Original. *Mr. Francis H. McGee*, Assistant Attorney General, was on the briefs. See *post*, p. 356.

*Mr. Patrick Henry Kelley* for the appellant in No. 696. See *post*, p. 357.

*Mr. Levy Mayer* and *Mr. William Marshall Bullitt* for the appellant in No. 752. See *post*, p. 357.

*Mr. Elihu Root* and *Mr. William D. Guthrie* for the appellant in No. 788. *Mr. Robert Crain* and *Mr. Bernard Hershkopf* were on the briefs. See *post*, pp. 361, 368.

*Mr. Ralph W. Jackman* for the appellee in No. 794. *Mr. William H. Austin* was on the brief. See *post*, p. 380.

*Mr. Charles A. Houts*, *Mr. John T. Fitzsimmons* and *Mr. Edward C. Crow*, for the appellant in No. 837, submitted. See *post*, p. 380.

*The Solicitor General* and *Mr. William L. Frierson*, Assistant Attorney General of the United States, for the defendants in No. 29, Original, the appellees in Nos. 752 and 788, and the appellants in No. 794. *Mr. Frierson* for the defendants in No. 30, Original, and for the appellees in No. 696, *The Solicitor General* appearing also on the briefs

in those cases. *The Solicitor General* and *Mr. Frierson*, for the appellees in No. 837, submitted. See *post*, p. 381.

By leave of court, briefs of *amici curiæ* were filed, viz: By *Mr. Charles E. Hughes*, with the attorneys general of numerous States, supporting the motions to dismiss the bill in No. 29, Original, and against the appeal in No. 752; by *Mr. Elihu Root* with *Messrs. William D. Guthrie, Robert Crain* and *Bernard Hershkopf*, supporting the bill in No. 29, Original; by *Mr. Alexander Lincoln* with *Mr. Michael J. Lynch*, supporting the bills in Nos. 29 and 30, Original; by *Mr. Aaron A. Ferris*, supporting the bill in No. 29, Original; by *Mr. Wayne B. Wheeler* with *Messrs. George S. Hobart, G. Rowland Monroe, R. C. Minton, J. A. White, B. W. Hicks, E. L. McIntyre* and *Walter H. Bender*, against the appeals in Nos. 696, 752 and 788, and supporting the appeal in No. 794; and by *Mr. Levi Cooke* with *Mr. George R. Beneman*, supporting the appeal in No. 788.

The chief contentions made in the numerous arguments will be here indicated as fairly as space limits permit— more fully in some of the cases to avoid undue abridgment and repetition in all.

*Mr. Rice*, for the State of Rhode Island, in No. 29, Original, confined his argument to the validity of the Amendment. Various objections were stated, the one chiefly elaborated being that the Amendment is an invasion of the sovereignty of the complaining State and her people, not contemplated by the amending clause of the Constitution. The amending power, it was contended, is not a substantive power but a precautionary safeguard inserted incidentally to insure the ends set forth in that instrument against errors and oversights committed in its formation. Amendments, as the term indeed implies, are to be limited to the correction of such errors.

350.        Argument for the State of Rhode Island.

The doctrine that any and every change may be introduced in guise of amendment is a novelty subversive of fundamental principles. It would bring about a constitutional revolution, converting the sovereignty of the people into a sovereignty of officials. It would permit the boundary between federal and state authority, established by the Constitution, to be shifted at will, as officials might be influenced by political cowardice or expediency, and would ultimately reduce the States to mere dependencies of the Federal Government.

All sovereignty resides in the people. The Constitution therefore was submitted for ratification to conventions chosen directly by the people. The possibility of federal encroachment upon state sovereignty was the subject of principal concern when the Constitution was in process of adoption, and, practically as a part of the process, the first ten amendments were added to prevent such encroachments. And it was generally understood and agreed that the boundaries set between state and federal powers were fundamental and permanent.

It is "This Constitution" that may be amended. "This Constitution" is not a code of transient laws but a framework of government and an embodiment of fundamental principles. By an amendment, the identity or purpose of the instrument is not to be changed; its defects may be cured, but "This Constitution" must remain. It would be the greatest absurdity to contend that there was a purpose to create a limited government and at the same time to confer upon that government a power to do away with its own limitations. All of the prior amendments have been declaratory and interpretative or have had relation to a power or to a subject-matter dealt with in the instrument itself. The amending function (under Art. V) is purely federal. The State is not a party to an amendment and her people do not participate. A legislature in ratifying does not act for the State and cannot limit her

sovereign powers. A State is bound in respect of sovereign powers only by the explicit act of her whole people. To be valid, an amendment must have such relation to the general grant of powers and to the scope and purposes of the Constitution as will carry an implication of assent on the part of the people of the United States, springing from their adoption of the Constitution.

In the case of this so-called amendment, the representatives of the people of the United States have attempted, not to amend the Constitution of the United States, but to amend the constitution of every State in the Union. If the amending function is construed as coextensive with absolute sovereignty, then the basis of our political system is no longer the right of the people of a State to make and alter their constitution, for their political institutions are at the mercy of others and may be changed against their will.

*Mr. McCran,* for the State of New Jersey, in No. 30, Original, attacked the Amendment as an invasion of state sovereignty not authorized by the amending clause and as not, properly speaking, an amendment, but legislation, revolutionary in character.

The right to amend the Constitution, in the manner provided by Article V, is a right incident to the powers of the citizens of the United States as distinguished from the right of the citizens of the respective States; no amendment can be made not of right belonging to the citizenship of the United States; all powers not enumerated and not of right belonging to the citizenship of the United States, are reserved to the respective States under Article X, including the right to legislate concerning the manufacture, use and sale intrastate of intoxicating liquors.

The Amendment is also invalid because its proposal was not affirmatively voted by two-thirds in number of both houses of Congress, and because the proposal did not on

its face disclose that both houses deemed the Amendment necessary.

Three-fourths of the States have not ratified it in the constitutional sense, because, in a number of the States counted, the proposal has been, or is subject to be, referred to the people, in pursuance of their constitutions.

Concurrent power under the Amendment is a power in the Federal Government to enforce it only as it relates to the external concerns of the United States or to the domain of the Federal Government in the regulation of interstate commerce heretofore recognized, as distinguished from the right of the State of New Jersey to enforce the Amendment intrastate by virtue of the power conferred upon her exclusively under the Amendment.

The National Prohibition Act is not appropriate legislation under the Amendment. It purports to regulate the manufacture, possession, sale and use of beverages which are not intoxicating and of liquor devoted to medicinal and other non-beverage uses.

*Mr. Patrick Henry Kelley,* for the appellant in No. 696, took the ground that the Amendment is not self-executing; that, until it is put in execution in the manner prescribed, the existing laws of the States concerning intoxicating liquors must stand unaffected; and that the only way in which the laws and sovereign powers of the States could be superseded under it would be by legislation enacted by the concurrent power of Congress and the several States in the only manner provided for such concurrent action, viz., as authorized by Article V of the Constitution.

*Mr. Levy Mayer* and *Mr. William Marshall Bullitt* for the appellant in No. 752:

. The power of "amendment" contained in Art. V does not authorize the invasion of the sovereign powers expressly reserved to the States and the people by the Ninth

and Tenth Amendments, except with the consent of *all* the States. If it be argued that the expression of one exception in Art. V negatives the possibility of others to be implied, the answer is to be found in the contrary principle of construction applied by this court to Art. I, § 7, in *Hollingsworth* v. *Virginia,* 3 Dall. 378, that the existence of one exception to a power does not make the power unlimited in all other respects, but that there may be other qualifications or exceptions not expressed literally.

If amendment under Art. V were unlimited, three-fourths of the legislatures would have it in their power to establish a state religion and prohibit free exercise of other religious beliefs; to quarter a standing army in the houses of citizens; to do away with trial by jury and republican form of government; to repeal the provision for a president; and to abolish this court and with it the whole judicial power vested by the Constitution. See *Ableman* v. *Booth,* 21 How. 506, 521. They might form several new States within other States, and, at the same time, form one State by the junction of two or more others (while still giving the old States their equal suffrage in the Senate), and thus concentrate the entire power of the Government in the hands of a few States acting in concert. Indeed, if such right to amend exists, then the three-fourths required by Art. V can be reduced to a majority or even a minority of the legislatures, or the requirement be dispensed with entirely.

A construction should be judged by its consequences. The fact that a construction "radically changes the whole theory of the relations of the State and Federal Governments to each other and of both these governments to the people" is an irresistible argument against it, "in the absence of language which expresses such a purpose too clearly to admit of doubt." *Slaughter-House Cases,* 16 Wall. 36, 78.

The Ninth and Tenth Amendments must be read, with the whole Constitution, exactly as if they had been a part of it from the outset. Before their adoption they were implied, and, after their adoption, they were, by Art. V, "to all intents and purposes part of this Constitution." *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 325; *McCulloch* v. *Maryland*, 4 Wheat. 316, 405; *Collector* v. *Day*, 11 Wall. 113, 124; *Gordon* v. *United States*, 117 U. S. 697, 705; 2 Elliot's Debates, pp. 435, 436.

"The power of amending the Constitution was intended to apply to amendments which would modify the mode of carrying into effect the original provisions and powers of the Constitution, but not to enable three-fourths of the States to grasp new power at the expense of any unwilling State." Curtis, Const. History of the United States, vol. 2, p. 160. Every one of the preceding seventeen amendments is concerned with and pertains to "the original provisions and powers of the Constitution." In addition, the Thirteenth, Fourteenth and Fifteenth Amendments were the result of the arbitrament of war, and their acceptance by the seceding States was made a condition of their readmission into the Union.

If it be decided that the legislatures of three-fourths of the States may, by ratification, validate any amendment, "the indestructible Union of indestructible States" will turn out to be a mere dream and the States will cease "to be coexistent with the National Government." *Texas* v. *White*, 7 Wall. 700, 725; *Lane County* v. *Oregon*, 7 Wall. 71, 76; *Railroad Co.* v. *Peniston*, 18 Wall. 5, 31.

It is a well-known and established historical fact that the Constitution was ratified by the original States with the distinct agreement that the Bill of Rights expounded in the first ten amendments would be immediately adopted. The States went into the Union with the understanding that by these amendments the sovereignty of the several States would be perpetually preserved, against all federal

encroachments, and no sound reason can be advanced for
maintaining that the Ninth and Tenth Amendments did
not forever preserve such sovereignty. The powers re-
served by those amendments are powers reserved from
the operation of Art. V, as well as from the operation
of any other articles of the Constitution.

Two-thirds of both houses of Congress did not vote
to propose the Eighteenth Amendment; and hence, it
was never properly submitted to the States for ratification.

The Eighteenth Amendment has not been ratified by
the legislatures of three-fourths of the States. Of the
forty-five States which have purported to ratify it, one
of them,—Ohio,—has rejected the Amendment by pop-
ular vote; and in twelve others petitions for a referendum
with respect to the Amendment have been presented, but
have not yet been submitted to the electorate. In these
States the people have reserved the right to make them-
selves a part of the "legislature."

The Eighteenth Amendment, like Art. V, must be con-
strued with the other provisions of the Constitution
(*Prout* v. *Starr*, 188 U. S. 537), including the Fifth Amend-
ment, which, being for the security of person and property,
should be construed liberally. *Boyd* v. *United States*, 116
U. S. 616, 635. The allegations of the bill in this case,
which are admitted, establish that the plaintiff could not
possibly have sold its stock of whiskey before the Amend-
ment became effective, and that the demand for non-
beverage purposes will be insignificant. To deprive of
the power of sale is to take the property itself. *Buchanan*
v. *Warley*, 245 U. S. 60, 74; *United States* v. *Cress*, 243
U. S. 316; *United States* v. *Lynah*, 188 U. S. 445; *Wyne-
hamer* v. *People*, 13 N. Y. 378, 387, 389, 396, 398. The
liquor has therefore been taken by the Government for
a public use, viz., for the protection of the people of the
United States from the alleged evils of the traffic in in-
toxicating liquors. This court, as is pointed out in *Hamil-*

ton v. *Kentucky Distilleries & Warehouse Co.,* 251 U. S. 146, has never held that even statutes passed pursuant to the police power of the State could be applied to liquor acquired before the enactment of the prohibitory law. One of the judgments affirmed in *Mugler* v. *Kansas,* 123 U. S. 623, referred to in *Ruppert* v. *Caffey,* 251 U. S. at p. 302, was for violation of the act by selling beer acquired before its enactment, but the beer involved was acquired after the enactment of the prohibition amendment to the constitution of Kansas, pursuant to which the law was passed. If an attempt be made to extend the doctrine of the *Hamilton Case, supra,* so as to hold that the Volstead Act does not appropriate stocks of liquor existing before the Eighteenth Amendment was proposed by Congress, because an insignificant non-beverage use is still permitted, it is sufficient to call attention to the irreconcilable conflict between such contention and the rule in *Buchanan* v. *Warley, supra.* Although the prohibition of a particular physical use to which property may be put (so long as the possession and title thereto are not interfered with) may under some circumstances not constitute a taking in violation of the Fourteenth Amendment, even if the monetary value be reduced (*Mugler* v. *Kansas, supra*), yet when, as here, the owner of the property is deprived of the rights of sale, transportation, and even of possession and use (except in a few limited instances) there is a taking of property. The whiskey sought here to be protected was manufactured on the faith of the rules of property established by decisions of this court.

*Mr. Root* for the appellant in No. 788:

I. The substantive and operative part of the so-called Eighteenth Amendment is contained in its first section. This provision does not relate to the powers or organization of government, as does an ordinary constitutional

provision. On the contrary, it is itself an exercise of the legislative power of government, and a direct act of legislation regulating the conduct of life of the individual. The first question before the court is, therefore, whether Article V of the Constitution authorizes any amendment which in substance and effect is merely a police regulation or statute.

To uphold such a power of amendment would do violence to what Hamilton (Federalist, No. 22, p. 135, Ford's ed.) described as "the fundamental maxim of republican government . . . which requires that the sense of the majority should prevail." If the so-called Eighteenth Amendment be a valid part of the Constitution, its repeal can hereafter be perpetually prevented by a minority, for if but one State more than one-fourth of the States refuse to assent thereto, it is irrepealable. The census of 1910 discloses that there are in the Union thirteen States whose aggregate population does not equal five per cent. of the entire population of the United States. Consequently, however vast the majority of the population in the future may be who are persuaded by experience that this direct legislative regulation of their lives and personal habits was or has become unwise and unnecessary, they will be helpless to change the law if there be dissent on the part of a minority representing only five per cent. of the population or perhaps less.

There is plainly a distinction in this respect between the so-called amendment as adopted and as it would be if it had conferred *power* upon Congress to prohibit the use of intoxicating liquors. An amendment in the latter form would, it is true, be precisely as irrepealable as the one here in question, but the conduct of individual life thereunder would at all times be within the control of representatives of the majority of the people. Congress would then have the power to prohibit intoxicants or not, completely or qualifiedly, as it from time to time deemed

· best; and if the majority of the people then desired prohibition, Congress could respond to their wish; and if, on the other hand, the majority thereafter became persuaded that extreme prohibition was no longer necessary, in that respect also Congress could effectuate the will of the people. In every free government the direct regulation of the lives of the people by legislation should at all times be in the hands of the majority, however the powers of government may be distributed and allocated.

This fundamental consideration differentiates sharply the Eighteenth Amendment from the Thirteenth Amendment, to which the Eighteenth bears a superficial resemblance. As is now universally conceded, slavery was the creation of positive law, and it was always unauthorized unless some exercise of government permitted it. A constitutional declaration that slavery was prohibited, would, therefore, in substance, be only the withdrawal from every governmental authority of the *power* to license or permit involuntary servitude. That amendment, consequently, only affected the *powers* of government, and did not constitute, as does the so-called Eighteenth Amendment, a direct legislative exercise of those powers.

Article V of the Constitution should not be construed to confer unlimited legislative power upon the amending authorities. To assume that it does is inconsistent with the plain provision of § 1 of Article I of the Constitution that "*all* legislative powers herein granted shall be vested in a Congress of the United States," and with the terms of Article V itself, as the proceedings of the Constitutional Convention disclose that the framers themselves understood those terms. The framers undoubtedly regarded the power to amend only as authorizing the inclusion of matter of the same general character as the instrument or thing to be amended; and as all the constitutions of their day were concerned solely with the distribution and limitation of the powers of government,

and not with the direct exercise thereof by the constitution makers themselves, no amendment of the latter sort would have been deemed appropriate or germane by them.

It does not advance the discussion to urge that *the people* can adopt any amendment to the Constitution they see fit. No doubt an amendment of any sort could be adopted by the same means as were employed in the adoption of the Constitution itself. In that manner alone do or can *the people* themselves act. But the amending authorities provided for in Article V of the Constitution, as clearly appears from the debates in the Constitutional Convention, are only *agents* of the people and not the people themselves. They must, therefore, act within the authority conferred in Article V, and that authority does not embrace the right under color of amendment to adopt mere sumptuary laws which are not constitutional amendments in truth or essence. The people could by appropriate proceedings amend the Constitution so as to impair such vital rights as freedom of religion, but it is inconceivable that any such unlimited power has been delegated to the amending agents, who may represent but a minority of the people. The census discloses that there are three-fourths of the States of the Union whose total population amounts to less than forty-five per cent. of the people of the United States, and two-thirds of a quorum of both houses of Congress may, therefore, likewise represent only a minority of the population.

Ratification by state legislatures does not as matter of fact provide an opportunity for the people to express their will regarding the proposed Eighteenth Amendment as the calling of conventions might have done. Thus, for example, the Missouri legislature ratified it, notwithstanding an express provision of the Missouri constitution (Art. II, § 3) forbidding them so to do, and in Ohio ratification by the legislature was subsequently rejected by the people at the polls, while in other States the people

have been denied all right to have the question of ratification referred to them for approval.

If, as contended by the defendants, the power of amendment vested in Congress and three-fourths of the state legislatures be absolute and unrestricted, then there would be no limitation whatever upon their legislative authority. They could then by amendment establish a state religion, or oppress or discriminate against any denomination, or authorize the taking away of life, liberty and property, without due process of law, etc., etc. This would destroy the most essential limitation upon power under the American system of government, which is that the rights of the individual citizen shall be protected by withholding from the legislative function the power to do certain things inconsistent with individual liberty. This was the reason of the irresistible demand for the first ten amendments.

When the Federal Constitution was adopted, the people of practically every State had limited by bills of rights their own governments in their own States, which were composed of men elected by themselves. We are not at liberty to assume that in and by Article V it was contemplated that they were vesting legislative power without limitation in the Congress and the legislatures of three-quarters of the States. For these reasons and others it is submitted that the adoption of the so-called Eighteenth Amendment by the agents of the people was beyond the amending power of such agents and therefore invalid.[1]

---

[1] Journal of Constitutional Convention of 1787, pp. 370, 70; 3 Documentary History of U. S. Constitution, pp. 405, 409, 410, 518; *McCulloch* v. *Maryland,* 4 Wheat. 316, 403, 407; *Cohens* v. *Virginia,* 6 Wheat. 264, 389; *State ex rel. Mullen* v. *Howell,* 107 Washington, 167; *Opinion of the Justices,* 118 Maine, 544; Federalist, No. 33 (Ford's ed.), pp. 202, 260, 263; 2 Elliot's Debates, pp. 126, 128, 364; 4 *id.,* pp. 144, 176, 188; 1 Bryce's American Commonwealth, p. 350; Story on the Constitution, 5th ed., § 352; Cooley on Constitutional Limitations,

II.   The Eighteenth Amendment, furthermore, if valid, would tend to undermine a fundamental principle of our federal system.   As Chief Justice Chase declared in *Texas* v. *White,* 7 Wall. 700, 725, "the Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."   Manifestly, the federal system of government created in the Constitution contemplated indestructible States—not indestructible geographic units merely, but indestructible self-governing, local sovereignties.   The establishment of our dual system of government must necessarily imply that neither government shall be permitted to destroy the other, and that the States must be preserved, not as mere electoral and administrative districts of a unified and consolidated national government, but as true local, self-governing sovereignties, inviolate and indestructible members of a dual, and not a consolidated, system of government, and with a perma-

7th ed., pp. 2–4, 50; Jameson on Constitutional Conventions, 4th ed., §§ 63, 85; *Vanhorne's Lessee* v. *Dorrance,* 2 Dall. 304, 308; Century Dictionary, tit. "Constitution"; Encyclopædia Britannica (9th ed.), tit. "Constitution"; Holland's Jurisprudence, 11th ed., p. 365; The Constitutional Review, April, 1918, p. 97; Mass. Law Quarterly, May, 1918, p. 334; *Southern Pac. Co.* v. *Jensen,* 244 U. S. 205, 227; Federalist, No. 15 (Ford's ed.), p. 87; *Marbury* v. *Madison,* 1 Cranch, 137, 176; *In re Pennsylvania Tel. Co.,* 2 Chester Co. Rep. 129; 5 Hinds' Precedents, §§ 5753, 5767; *Gagnon* v. *United States,* 193 U. S. 451, 457; *Shields* v. *Barrow,* 17 How. 130, 144; Federalist No. 43 (Ford's ed.), p. 291; *id.,* No. 85, p. 586; 3 Elliot's Debates, pp. 233–4; *Commonwealth* v. *Griest,* 196 Pa. St. 396, 404; *Warfield* v. *Vandiver,* 101 Md. 78; *Livermore* v. *Waite,* 102 Cal. 113, 118, 119; *Gibbons* v. *Ogden,* 9 Wheat. 1, 187, 188; *Calder* v. *Bull,* 3 Dall. 386, 388; *Fletcher* v. *Peck,* 6 Cranch, 87, 139; *Loan Association* v. *Topeka,* 20 Wall. 655, 663; *Murphy* v. *Ramsey,* 114 U. S. 15, 44; *Collector* v. *Day,* 11 Wall. 113, 127; *Hollingsworth* v. *Virginia,* 3 Dall. 378; Madison's Notes, Sept. 12, 1787, p. 720, *Legal Tender Cases,* 12 Wall. 457; *Texas* v. *White,* 7 Wall. 700, 720, 724; *Sturges* v. *Crowninshield,* 4 Wheat. 122, 192; 3 Elliot's Debates, pp. 446–7; *Somerset* v. *Stewart,* 20 State Trials, 1, 82; 2 Mass. Law Quarterly, pp. 437–44; *Slaughter-House Cases,* 16 Wall. 36, 67, 68.

nent and effectual reason for being, namely, the possession of the power and the right to exercise forever the functions of internal and local self-government.

The so-called Eighteenth Amendment *directly* invades the police powers of the States and *directly* encroaches upon their right of local self-government. If this amendment be valid, then any amendment which directly impairs the police powers of the States and absolutely withdraws from them their right to local self-government in any important particular, heretofore indisputably a matter of internal concern, must likewise be valid. In other words, if the so-called Eighteenth Amendment be lawful, then the States are not in truth indestructible. It must be manifest that the precedent necessarily erected by a holding that the Eighteenth Amendment is constitutional, would authorize the complete subversion of our dual and federal system of government. It is submitted that the authority conferred in Article V to amend the Constitution carries no power to destroy its federal principle in a most fundamental aspect.

The Civil War amendments afford no justification for the Eighteenth Amendment. Their primary purpose was to crystallize into the Constitution some of the essentials of a free republican government, and it was expressly made the constitutional duty of the Federal Government to guarantee to the States such a form of government. This federal duty the Civil War amendments helped to realize; and the fact that, as an incident and indirectly, they interfered to some extent with the States is of no consequence. They are not like the Eighteenth Amendment, which is germane to no original federal duty, and which directly, primarily and deliberately invades the right of the States to govern themselves.[1]

---

[1] *McCulloch* v. *Maryland*, 4 Wheat. 316, 327, 403, 431; *Cohens* v. *Virginia*, 6 Wheat. 264, 389; *Texas* v. *White*, 7 Wall. 700, 725, 728; *Hammer* v. *Dagenhart*, 247 U. S. 251, 275; *Gordon* v. *United States*, 117

*Mr. Guthrie* for the appellant in No. 788:

The correct construction of § 2 of the Eighteenth Amendment required the concurrence of the State of New Jersey in any legislation of Congress regulating internal or intrastate commerce in intoxicating liquors, and conversely required the concurrence of Congress in any legislation of the State regulating interstate or foreign commerce in intoxicating liquors; but that section did not impair or qualify the existing reserved power of the several States independently to regulate their own internal or intrastate commerce or the existing power of

U. S. 697, 701, 705; *Rathbone* v. *Wirth*, 150 N. Y. 459, 470, 483–4; *Calder* v. *Bull*, 3 Dall. 386, 388; *Loan Association* v. *Topeka*, 20 Wall. 655, 662–3; *Veazie Bank* v. *Fenno*, 8 Wall. 533, 541; *Collector* v. *Day*, 11 Wall. 113, 124, 125, 127; *Downes* v. *Bidwell*, 182 U. S. 244, 290–1; *Murphy* v. *Ramsey*, 114 U. S. 15, 44; *Matter of Fraser* v. *Brown*, 203 N. Y. 136, 143; *Keller* v. *United States*, 213 U.S. 138, 148; *Colon* v. *Lisk*, 153 N. Y. 188, 194; *Brown* v. *Maryland*, 12 Wheat. 419, 439; *Civil Rights Cases*, 109 U. S. 3, 11–15, 19, 20; *In re Rahrer*, 140 U. S. 545, 554–6; *Matter of Heff*, 197 U. S. 488, 505; *South Carolina* v. *United States*, 199 U. S. 437, 448, 451, 453–4; *State ex rel. Mullen* v. *Howell*, 107 Washington, 167; *License Cases*, 5 How. 504, 583, 628; *Noble State Bank* v. *Haskell*, 219 U. S. 104, 111; *Sligh* v. *Kirkwood*, 237 U. S. 52, 59; *Ives* v. *South Buffalo R. Co.*, 201 N. Y. 271, 300; *Patterson* v. *Kentucky*, 97 U. S. 501, 503; *Fertilizing Co.* v. *Hyde Park*, *id.*, 659, 667; *Ex parte Rowe*, 4 Ala. App. 254; *Stone* v. *Mississippi*, 101 U. S. 814, 819–20; *N. Y. & N. E. R. R. Co.* v. *Bristol*, 151 U. S. 556, 567; *Atlantic Coast Line R. R. Co.* v. *Goldsboro*, 232 U. S. 548, 558; 2 Hare on American Constitutional Law, p. 766; Cooley on Constitutional Limitations (7th ed.), pp. 101–2, 243, 263; *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 629; *Lane County* v. *Oregon*, 7 Wall. 71, 76; *Ex parte Bain*, 121 U. S. 1, 12; Story on the Constitution, § 1908; *Slaughter-House Cases*, 16 Wall. 36, 67, 68, 70–1, 77–8; *Northern Securities Co.* v. *United States*, 193 U. S. 197, 348; *Kentucky* v. *Dennison*, 24 How. 66, 107; *Guinn* v. *United States*, 238 U. S. 347, 362; *United States* v. *Railroad Co.*, 17 Wall. 322, 327; *Pollock* v. *Farmers' Loan & Tr. Co.*, 157 U.S. 429, 584; Congressional Globe, 38th Cong., 1st sess., p. 2985; Elliot's Debates, vol. II, pp. 304, 309; vol. IV, pp. 53, 58; 2 Curtis on the Constitutional History of the United States, pp. 160–1; Miller on the Constitution, pp. 24, 412; 1 Tucker on the Con-

Congress to regulate interstate or foreign commerce or the internal commerce of the District of Columbia, the Territories, or the Insular Possessions.

The prohibition contained in § 1 of the Amendment is self-executing. *Civil Rights Cases,* 109 U. S. 3, 20. If the Amendment contained no grant of power of enforcement, Congress would have complete power to enforce the prohibition as it saw fit in interstate or foreign commerce or domestically in the District of Columbia, etc., and the States would have power to enforce it within their respective jurisdictions as to their intrastate or internal commerce. But Congress then would have no power under the Constitution to legislate in respect of the internal commerce of a State even with its consent and a State could not constitutionally legislate in respect of interstate or foreign commerce without the assent or concurrence of Congress. The second section of the Amendment granted to Congress the additional or supplemental power to authorize federal officers to enter the States and apply and enforce the sanctions of federal or state legislation in respect of their internal affairs provided the State concurred in such legislation, and it granted to the respective States the power to apply and enforce their legislation or the legislation of Congress against interstate and foreign

stitution, pp. 323–4; *United States* v. *Cruikshank,* 92 U. S. 542, 552, 554, 555; *Wilkinson* v. *Leland,* 2 Pet. 627, 647, 657; *State* v. *Keith,* 63 N. Car. 140, 144; *Eason* v. *State,* 11 Ark. 481, 491; *Coyle* v. *Oklahoma,* 221 U. S. 559, 580; 2 Madison's Notes (Farrand), pp. 629–31; *Maxwell* v. *Dow,* 176 U. S. 581, 601–2; *State* v. *St. Louis & S. W. Ry. Co.,* 197 S. W. 1012, 1013 (Tex.); *Alexander* v. *People,* 7 Colo. 155, 167; Federalist (Ford's ed.), Nos. 39 and 43, pp. 251, 291–2; *Spies* v. *Illinois,* 123 U. S. 131, 161; *Barron* v. *Baltimore,* 7 Pet. 243, 250; *Minn. & St. Louis R. R.* v. *Bombolis,* 241 U. S. 211, 217; *Barbier* v. *Connolly,* 113 U. S. 27, 31; *Bartemeyer* v. *Iowa,* 18 Wall. 129, 138; *Mugler* v. *Kansas,* 123 U. S. 623, 663; *In re Kemmler,* 136 U. S. 436, 448, 449; *Stewart* v. *Kahn,* 11 Wall. 493, 507; *Dred Scott* v. *Sandford,* 19 How. 393; Cong. Globe, 39th Congress, 1st sess., pt. 3, p. 2766; *id.,* pt. 4, p. 2961.

commerce, provided Congress concurred in such state legislation.

This construction would give reasonable scope and effect to § 2 and every word thereof; would be consistent with the plan and provisions of the Constitution as a whole; would recognize the dual sovereignty in our federal system of Nation and State each supreme within its own sphere; would tend to promote coöperation and harmonious, effective, economical and satisfactory enforcement of the prohibition of intoxicating liquors, and would be efficient, conservative and beneficent as a practical method of enforcement. In other words, such a construction would not interfere with the power of Nation or State within their respective and exclusive spheres, would provide for coöperation in enforcement when found desirable, and would make fixed and permanent the constitutional principle and the governmental policy embodied in the acts of Congress known as the Wilson Act of August 8, 1890, the Webb-Kenyon Act of March 1, 1913, and the Reed Amendment of March 3, 1917. Indeed, the learned Assistant Attorney General urged, after referring to the decisions of the court in *Clark Distilling Co.* v. *Western Maryland Ry. Co.*, 242 U. S. 311, and *United States* v. *Hill*, 248 U. S. 420, that § 2 of the Amendment in providing for concurrent power was not revolutionary or an innovation in principle, but made a permanent part of the Constitution the principle upon which these three intoxicating liquor statutes of Congress had been sustained.

Section 2 of the Amendment in providing for concurrent power of enforcement is unique and unprecedented and a departure from the precedents of the Thirteenth, Fourteenth and Fifteenth Amendments. The different form was adopted and submitted to the States for their approval undoubtedly because more likely to be acceptable if the States were retaining a voice in regulations affecting their

own internal affairs.   The controlling inquiry, however, is not so much what Congress itself understood as what the States reasonably understood from the language of the proposed Amendment as submitted by Congress.   *State* v. *St. Louis & S. W. Ry. Co.*, 197 S. W. 1012, 1013; *Alexander* v. *People*, 7 Colorado, 155, 167; *White* v. *Hoyt*, 73 N. Y. 505, 511.   Did they understand that they were surrendering to Congress their then exclusive legislative power over the internal traffic in intoxicating liquors?   Did they understand that they were turning over to Congress practically supreme control over intrastate regulation in all its phases?   Would not such a radical and far-reaching surrender and new delegation of power to Congress, in conflict with our traditions and history and our dual system, have readily found apt and direct expression?

Section 1 shows that the controlling thought of Congress was to secure national prohibition; and § 2 shows a purpose to commend this main proposal to the States for their acceptance by assuring them of the least possible interference with their police powers.   This would tend to secure ratification when a proposition to. surrender or abdicate their police powers would probably have been rejected.   The question, therefore, upon which state legislatures voted was, Shall there be national prohibition without loss of state control over local affairs?   The construction now urged by the Government, however, would result practically. in complete loss of state control. Disguise it as they may, the learned counsel for the Government ask the court to give no practical effect whatever to the clause which was the inducement to the States to ratify the proposed prohibition Amendment.

The history of the proposed Amendment in the. Sixty-fifth Congress should be traced and the following facts emphasized, namely, that both houses rejected the form originally proposed which vested power in "the Congress and the several States independently or concurrently to

enforce" the proposed Amendment; that the Senate adopted on August 1, 1917, a form limiting the power of enforcement to Congress alone as in the prior constitutional amendments, that this form was not acceptable to the House, and that the Amendment made by the House and concurred in by the Senate vested in "the Congress and the several States . . . concurrent power to enforce." The significance and effect of this amendment cannot be disregarded unless it is to be held that the change of wording made no change whatever in practical meaning, and that the language of the modification made by the House can be disregarded as of no practical effect whatever notwithstanding "the elementary canon of construction which requires that effect be given to every word of the Constitution" as declared in *Knowlton* v. *Moore*, 178 U. S. 41, 87; and see also *Hurtado* v. *California*, 110 U. S. 516, 534; *Holmes* v. *Jennison*, 14 Pet. 540, 570–571; *United States* v. *Standard Brewery, Inc.*, 251 U. S. 210, 218; *Schick* v. *United States*, 195 U. S. 65, 68; *Newell* v. *People*, 7 N. Y. 9, 97; Cooley's Constitutional Limitations, 7th ed., p. 92.

Ordinary definitions of the adjective "concurrent" show its current meaning to be "concurring or acting in conjunction; agreeing in the same act, contributing to the same event or effect; operating with; coincident" (Century Dictionary). See also Webster and Standard Dictionaries. The exact meaning can be determined by a consideration of the subject-matter, probable purpose and context. *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 19; 1 Story on the Constitution, § 455; *Wedding* v. *Meyler*, 192 U. S. 573, 584; *In re Mattson*, 69 Fed. Rep. 535, 542; *Ex parte Desjeiro*, 152 Fed. Rep. 1004, 1007; *Nielsen* v. *Oregon*, 212 U. S. 315.

For thirty years prior to the framing of the Eighteenth Amendment there had been a public movement and tendency to secure coöperation, that is, *concurrence*,

between Nation and State in the regulation and prohibition of intoxicating liquors, as evidenced by the legislation of Congress in the Wilson Act in 1890, the Webb-Kenyon Act in 1913, and the Reed Amendment in 1917. The Wilson Act was based upon the language of this court in *Leisy* v. *Hardin,* 135 U. S. 100, 119, which suggested that the States could regulate interstate commerce in intoxicating liquors if Congress assented by appropriate legislation, and the act was upheld upon that theory, not only in respect of interstate commerce, but in respect of foreign commerce as well. *In re Rahrer,* 140 U. S. 545; *Delamater* v. *South Dakota,* 205 U. S. 93; *De Bary* v. *Louisiana,* 227 U. S. 108. In furtherance of this policy of coöperation and *concurrence* with the States, which thus began with the Wilson Law in 1890, Congress passed the Webb-Kenyon Law of 1913, and the Reed Amendment of 1917. *Vance* v. *Vandercook Company,* 170 U. S. 438; *Clark Distilling Co.* v. *Western Maryland Ry. Co.,* 242 U. S. 311; *United States* v. *Hill,* 248 U. S. 420. The Chief Justice declared in the *Clark Distilling Co. Case* that the regulation of intoxicating liquors was "a subject as to which both State and Nation in their respective spheres of authority possessed supremest authority" and that "Congress in adopting a regulation had considered the nature and character of our dual system of government, State and Nation, and instead of absolutely prohibiting, had so conformed its regulation as to produce coöperation between the local and national forces of government to the end of preserving the rights of all." *Slaughter-House Cases,* 16 Wall. 36, 78. Under these acts of Congress there was no uniformity as to regulation of interstate commerce in intoxicating liquors, for such commerce was subjected to the varying regulations of the respective States.

The Eighteenth Amendment, therefore, embodied in a permanent constitutional provision a principle that had

been judicially sustained as within the scope of the constitutional power of Congress, though not without dissent in this court and on the part of President Taft and the then Attorney General, and it had been a matter of grave constitutional controversy in Congress and in the forum of public opinion whether the decisions of this court were based on sound reasoning and tenable grounds.

The principal ground upon which the supremacy of the National Prohibition Act was deduced by the learned court below, even as to intrastate regulation, was that by Article VI the Constitution and all laws and treaties made in pursuance thereof are declared to be the supreme law of the land, anything in any state constitution or statute to the contrary notwithstanding. But Article VI applies and controls only when an act of Congress is passed *in pursuance* of the Constitution, and if the Eighteenth Amendment requires the concurrence of the State, an act of Congress without such concurrence cannot be said to have been passed in pursuance of the Constitution. Indeed, it should logically and reasonably follow that the insertion of the word "concurrent" in the Eighteenth Amendment was for the very purpose of preventing Article VI from operating to make the legislation of Congress supreme and practically exclusive. It begs the whole question to advance Article VI as controlling.

The clause vesting concurrent power cannot mean one thing as applied to the action of the several States, and quite another and different thing when applied to the action of Congress. It cannot mean that if there be conflict, the action of Congress must control, for that would plainly be to say that the power of the States was not concurrent, but subordinate, and, in practical effect, no power at all. *Wedding* v. *Meyler*, 192 U. S. 573, 584; *Nielsen* v. *Oregon*, 212 U. S. 315; *I re Mattson*, 69 Fed. Rep. 535, 542; *Ex parte Desjeiro*, 152 Fed. Rep. 1004, 1007; *Houston* v. *Moore*, 5 Wheat. 1, 22; *Passenger Cases*, 7 How.

282, 395, 396, 399. If, therefore, the clause in question does not authorize the States to invade the field of federal jurisdiction, *i. e.*, interstate and foreign commerce, without the concurrence of Congress, it would be illogical to argue that it authorized Congress to invade the field of state jurisdiction without the concurrence of the States.

It is not contended by the appellant that Congress and the several States must adopt identical or practically identical enforcement measures, or that any enforcement act adopted by one must be wholly inoperative if not adopted by the other. But it is assumed that no unnecessary fundamental change in the federal system and its controlling and vivifying spirit was intended or contemplated, that the Nation and the State were to continue supreme and independent each within its own historic and constitutional sphere, that no undue interference of one with the other was intended, and that additional or supplemental power was being granted to both, which would authorize each to enter the sphere of the other provided the latter concurred; in other words, coöperated by concurring.

The appellant further contends that Title II of the National Prohibition Act is unconstitutional in certain particulars because not appropriate legislation and because it contains arbitrary and oppressive provisions depriving persons of their property rights without due process of law.

It is conceded of record by the Government and not challenged in its argument that the definition contained in § 1 of Title II of the National Prohibition Act includes beverages which are as matter of fact non-intoxicating. The prohibition of the Eighteenth Amendment, however, is expressly limited to intoxicating liquors.

The power of Congress in peace times to enforce the specific prohibition of intoxicating liquors is not as broad and comprehensive as the police powers of the States.

The case of *Ruppert* v. *Caffey*, 251 U. S. 264, does not hold otherwise. The court was then dealing solely with the war power of Congress, which is the highest attribute of governmental sovereignty, and the comparison in the opinion in that case with the state police power as an analogy was merely to illustrate freedom from restraint.

Incidental power to enforce a grant of power to Congress cannot be used to enlarge and expand the grant itself—particularly when to allow it would impinge upon the reserved powers of the States. *Civil Rights Cases*, 109 U. S. 3. The mere fact that the prohibition of non-intoxicating beverages may in the judgment of Congress tend to aid and render more effective the enforcement of prohibition against intoxicating liquors is insufficient. *United States* v. *Dewitt*, 9 Wall. 41; *Civil Rights Cases*, 109 U. S. 3; *Hodges* v. *United States*, 203 U. S. 1; *Hammer* v. *Dagenhart*, 247 U. S. 251.

The first section of Title II of the National Prohibition Act plainly purports to constitute no more than a definition of the term "intoxicating liquors" as used in the Eighteenth Amendment. It was enacted as and for a definition, and that is its declared intent. The provision might not have been enacted had its wording been changed so as to declare that it was in truth not a definition at all, but was being inserted in the act because it was believed to be advisable to include non-intoxicating liquors in order more effectively to enforce the prohibition against intoxicating liquors. The definition of an intoxicating liquor is one distinct and concrete idea and intent; the banning of non-intoxicating liquors as an incidental measure of enforcement is quite a different idea and intent.

No more objectionable or dangerous doctrine could be imagined than that an enactment, clearly avowed and intended to be a definition of a constitutional term and

having in view solely that purpose and end, can be sustained as an exercise of a very different power and intent having in view a different end and supported by entirely different considerations—an intent and purpose that may not have been in the minds of Congress at the time. Such a practice, if tolerated, would enable the courts to attribute to a statute a meaning and effect not at all contemplated or understood by those who enacted it, and possibly in conflict with their actual intent.

It may be proper, in reviewing state legislation which has been upheld by a state court as within the legislative powers of a State, for this court to attribute the intent as found by the state court, and not at all permissible to attribute an intent not expressed in the case of a provision in an act of Congress purporting on its face solely to be a definition and passed in the exercise of a distinctly limited power of legislation—as here limited to intoxicating liquors. Congress is always exercising delegated, limited, circumscribed and enumerated powers, and not the broad and elastic police powers of a State.

The Eighteenth Amendment must be read in connection with the Tenth Amendment. It could not have been intended by the use of the phrase "appropriate legislation" to authorize Congress to construe a prohibition limited to intoxicating liquors as including authority to regulate the vast field of non-intoxicating beverages, which the Amendment itself had left unprohibited and therefore free for state regulation.

Sixty years of regulation by Congress of the alcoholic content of beverages has demonstrated that adequate provisions for licensing and supervising the production of non-intoxicating malt or vinous liquors at the breweries or places of manufacture, and for licenses, stamps, labels and inspection certificates before shipment, could easily have been framed, as was done in respect of analogous subjects in the Food and Drug Act of Congress of June 30,

1906; the Meat Inspection Act of March 4, 1907; the Insecticide Act of April 26, 1910; the Plant Quarantine Act of August 20, 1912; the Pure Seed Act of August 24, 1912, and the Grain Standards Act of August 11, 1916.

If non-intoxicating beer, ale and porter may be prohibited, and even the use of their names made a criminal offense, because they look like intoxicating liquor, then grape juice, which looks like many kinds of wine, and syruped soda-water, nearly all the varieties of which look like some species of intoxicating liquors, may also be prohibited. It may be properly mentioned in this connection as a *reductio ad absurdum* that water looks like gin! It seems to be urged that it is merely a question of degree of regulation, and that the court ought not to override the judgment of Congress on any question of degree in the exercise of its constitutional powers. But the court is constantly called upon to determine just such questions of degree.

The case of *Purity Extract Co.* v. *Lynch*, 226 U. S. 192, principally relied on by the Government, is readily distinguishable if it be borne in mind that the state legislation then in question was enacted in the exercise of the unlimited police power of the State and that the legislation had been sustained by the highest court of the State as not prohibited by the state constitution.

The definition of intoxicating liquors as those containing one-half of one per cent. or more by volume of alcohol is arbitrary and contrary to conceded facts. This standard of alcoholic content originated for purposes of federal internal revenue taxation in connection with the Civil War Revenue Act of July 13, 1866, 14 Stat. 164, § 48, and was first adopted by the Treasury Department as a test of what should be deemed "fermented liquors" under taxing statutes. Treasury Decision Special No. 102, May 17, 1871; T. D. No. 804, June 29, 1904; T. D. No.

892, April 26, 1905; T. D. No. 1307, February 5, 1908; T. D. No. 1360, May 19, 1908; T. D. No. 2354, August 2, 1916; *United States* v. *Standard Brewery*, 251 U. S. 210, 219; P. O. Department Liquor Bulletin No. 2, June 15, 1917. States adopted the same standard as a matter of practical, convenient and economical administration. See, *e. g.*, New York Liquor Tax Law, § 2, subd. 6; Revised Code of Delaware, c. 6, Art. 11, § 137; Oregon General Laws of 1905, c. 2, § 18; Oklahoma Constitution, Prohibition Amendment of 1907. As state legislatures could, if they saw fit, prohibit not only intoxicating liquors but liquors containing no alcohol at all (*Purity Extract Co.* v. *Lynch*, 226 U. S. 192), the present question could not arise.

The definition of an intoxicating liquor contained in § 1 of Title II of the National Prohibition Act is conceded on the record to be arbitrary and false, and it is not even attempted to be upheld as a definition. As declared by this court in *Eisner* v. *Macomber*, 252 U. S. 189, Congress cannot by any definition conclude the matter, since it cannot by legislation alter the Constitution or add to its powers. The authority conferred by the Amendment is not as to liquor in general but only as to "intoxicating liquors for beverage purposes." If Congress can under the guise of a definition or of appropriate enforcement legislation forbid the manufacture and sale of non-intoxicants as a State may under the doctrine of the *Purity Extract Co. Case*, it can likewise, under the plea that it deems it necessary, forbid the manufacture and sale of any liquor whatever, whether alcoholic or not, for medicinal, industrial, or sacramental purposes; for if one qualifying and limiting term, *i. e.*, "intoxicating," can be disregarded, the other qualifying term of the same nature and of no higher obligation, may also be deleted. Such a method of construing a constitutional provision is condemned by settled canons of constitutional interpretation, and more

important still is the fact that it would violate fundamental principles of honesty and good faith in public affairs.

*Mr. Jackman* for the appellee in No. 794, advanced the following propositions:

Neither Congress nor the several States have power to. define "intoxicating liquor" under the Eighteenth Amendment.

Congress cannot under the enforcement clause enlarge the express grant of power so as to include beverages. non-intoxicating in fact.

The State of. Wisconsin having, under the power reserved and granted it by the Amendment, enacted legislation to enforce the prohibition, and not having concurred in the later congressional legislation, the act of Congress cannot be enforced and the state law overridden as to strictly intrastate transactions.

The Amendment is void because (a) it is not an amendment within the meaning of Article V, (b) it violates the Tenth Amendment.

*Messrs. Houts, Fitzsimmons* and *Crow*, for the appellant in No. 837, submitted, on the following main propositions:

The Amendment has not been ratified by three-fourths of the. States.

It is invalid as an amendment, leading to the destruction of the system of dual. sovereignties, and also as an attempt to exercise ordinary legislative power.

Under § 2 of the Amendment concurrence of the State is. necessary to render the act of Congress effective as to internal transactions.

The National Prohibition Act is not appropriate legislation under the Amendment. (For the reasons stated in the other cases.)

350.   Argument of Solicitor General and Asst. Attorney General.

·. The Amendment destroys appellant's property, existent before its adoption, and is therefore unconstitutional.

Argument of *The Solicitor General* and *Mr. Assistant Attorney General Frierson:*

The bills filed by the States of Rhode Island and New Jersey can not be maintained. They seek to enjoin officers of the Federal Government from enforcing criminal laws enacted by Congress. The sole ground upon which the original jurisdiction of this court can be invoked is that they involve controversies between a State and the citizens of other States. The fact that a State assumes to sue and names as defendants citizens of other States is not conclusive that this court must take jurisdiction. The judicial power of the United States over controversies to which a State is a party extends only to those cases "in which a State may, of right, be made a party defendant, as well as in all cases in which a State may, of right, institute a suit in a court of the United States." *United States* v. *Texas*, 143 U. S. 621, 644; *Wisconsin* v. *Pelican Insurance Co.*, 127 U. S. 265. A State can not invoke judicial action by making the case of its citizens its own and thus suing in vindication of grievances of particular individuals. *New Hampshire* v. *Louisiana*, 108 U. S. 76; *South Dakota* v. *North Carolina*, 192 U. S. 286; *Louisiana* v. *Texas*, 176 U. S. 1, 16, 24–25.

The questions as to whether the Eighteenth Amendment is of such a nature as to be within the amending power provided by Article V of the Constitution, and whether the Eighteenth Amendment has, in fact, been ratified, are questions committed by the Constitution to the political branch and not to the judicial branch of the Government. *Luther* v. *Borden*, 7 How. 42–43, 45; *Pacific Telephone Co.* v. *Oregon*, 223 U. S. 118; *Mississippi* v. *Johnson*, 4 Wall. 475; *Georgia* v. *Stanton*, 6 Wall. 50; *Field* v. *Clark*, 143 U. S. 649, 680; *Harwood* v. *Wentworth*,

162 U. S. 547, 562; *Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 143; *Myers* v. *Anderson*, 238 U. S. 368, 373–374; 15 Stat. 707–711.

The Eighteenth Amendment, establishing a fundamental rule of law, is an amendment within the meaning of Article V of the Constitution. The Constitution and the amendments heretofore adopted are full of rules of law by which the activities of the various agencies of government, both state and federal, and the rights and duties of persons are fixed or regulated. The Thirteenth Amendment, particularly, is almost an exact prototype of the Eighteenth Amendment and operates upon individuals in the same way. It has always been understood that there is no limitation upon the character of amendments which may be adopted, except such limitations as are imposed by Article V itself. Washington's Writings, vol. XII, pp. 4–5, 222. With these specific limitations, whatever amendments or changes Congress may deem necessary to propose are incorporated in the Constitution if ratified in the manner provided by Article V. Gales and Seaton, Annals of Congress, vol. 1, p. 712.

The fact that the Eighteenth Amendment confers upon Congress a power which had previously belonged exclusively to the States does not prevent that Amendment from being within the amending power conferred by Article V of the Constitution. A provision to the effect that no State should, without its consent, "be affected in its internal police" by an amendment to the Constitution was twice proposed in the Convention and twice rejected. Elliot's Debates, vol. 1, pp. 316–317; Madison's Papers, pp. 531–532, 551–552. In scope, the amending power is now limited as to but one subject, namely, the equal representation of the States in the Senate. Willoughby on the Constitution, § 227. Many of the amendments heretofore adopted have taken away from the States powers previously reserved to them. This is particularly

true of the Thirteenth, Fourteenth and Fifteenth Amendments. *Minor* v. *Happersett*, 21 Wall. 162, 172.

No State by any provision of its laws or its constitution can make the ratification of an amendment to the Constitution of the United States by its legislature subject to a referendum vote of the people. The only method of ratification mentioned in the Constitution is through representatives assembled either in the legislature or a convention called for that purpose. It is clearly contemplated that the action of the State in ratifying shall not be by direct vote of the people but by their representatives, and the body, or bodies, who shall be recognized as acting for the States are specifically named. A legislature in ratifying an amendment, therefore, derives its power not from the State or the people of the State but from the people of the United States through the Constitution of the United States. This power can not be abrogated, limited, or restricted by any state statute or constitution, *Dodge* v. *Woolsey*, 18 How. 331, 348; *McPherson* v. *Blacker*, 146 U. S. 1, 34; Gales and Seaton, Annals of Congress, vol. 1, p. 716; *Davis* v. *Ohio*, 241 U. S. 565.

The Volstead Act, if otherwise constitutional, is effective in all the States without the concurrence of any state legislature. The effect of § 2 of the Eighteenth Amendment, providing that Congress and the several States shall have concurrent power to enforce the Amendment by appropriate legislation, enables Congress and the several state legislatures to enact such laws as they deem necessary to suppress the liquor traffic—the laws of Congress to be enforced through the courts of the United States, and the laws of each State to be enforced through its own courts. The provision is not that legislation shall be concurrent, but that the concurrent power to legislate shall exist. Congress and the several state legislatures may, therefore, legislate for the accomplishment of the same purpose, but independently of each other. *Fox* v.

*Ohio,* 5 How. 410, 418, 432; *Houston* v. *Moore,* 5 Wheat. 1, 47; *Prigg* v. *Pennsylvania,* 16 Pet. 536, 621; *Gibbons* v. *Ogden,* 9 Wheat. 1, 209; *Covington, etc., Bridge Co.* v. *Kentucky,* 154 U. S. 204, 209, 211; *Passenger Cases,* 7 How. 282, 396; *United States* v. *Marigold,* 9 How. 559.

In order to enforce, with any degree of efficiency, the Eighteenth Amendment, a definition of intoxicating liquor was essential. The definition provided by the Volstead Act includes nothing which Congress could not properly deem necessary to enforce the provisions of the Amendment, and therefore is not arbitrary. *Crane* v. *Campbell,* 245 U. S. 304, 308; *Purity Extract Co.* v. *Lynch,* 226 U. S. 192; *Ruppert* v. *Caffey,* 251 U. S. 264.

The fact that by the passage of the Volstead Act on October 28, 1919, and the going into effect of the second title of that act and the Eighteenth Amendment on January 16, 1920, the sale of non-intoxicating beer containing as much as one-half of one per centum of alcohol was prohibited by the War Prohibition Act does not render Title II of the Volstead Act invalid, even as to the sale of such beer lawfully manufactured before October 28, 1919. *Mugler* v. *Kansas,* 123 U. S. 623; *Hamilton* v. *Kentucky Distilleries & Warehouse Co.,* 251 U. S. 146, 156–157; *Ruppert* v. *Caffey,* 251 U. S. 264.

The fact that the Amendment does not provide compensation for liquors previously manufactured does not render it invalid.

MR. JUSTICE VAN DEVANTER announced the conclusions of the court.

Power to amend the Constitution was reserved by Article V, which reads:

"The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legisla-

tures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three' fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate."

The text of the Eighteenth Amendment, proposed by Congress in 1917 and proclaimed as ratified in 1919, 40 Stat. 1050, 1941, is as follows:

"Section 1. After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited.

"Sec. 2. The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation."

We here are concerned with seven cases involving the validity of that Amendment and of certain general features of the National Prohibition Law, known as the Volstead Act, c. 83, 41 Stat. 305, which was adopted to enforce the Amendment. The relief sought in each case is an injunction against the execution of that act. Two of the cases —Nos. 29 and 30, Original,—were brought in this court, and the others in district courts. Nos. 696, 752, 788 and 837 are here on appeals from decrees refusing injunctions, and No. 794 from a decree granting an injunction. The cases have been elaborately argued at the bar and in

printed briefs; and the arguments have been attentively considered, with the result that we reach and announce the following conclusions on the questions involved:

1. The adoption by both houses of Congress, each by a two-thirds vote, of a joint resolution proposing an amendment to the Constitution sufficiently shows that the proposal was deemed necessary by all who voted for it. An express declaration that they regarded it as necessary is not essential. None of the resolutions whereby prior amendments were proposed contained such a declaration.

2. The two-thirds vote in each house which is required in proposing an amendment is a vote of two-thirds of the members present—assuming the presence of a quorum—and not a vote of two-thirds of the entire membership, present and absent. *Missouri Pacific Ry. Co.* v. *Kansas*, 248 U. S. 276.

3. The referendum provisions of state constitutions and statutes cannot be applied, consistently with the Constitution of the United States, in the ratification or rejection of amendments to it. *Hawke* v. *Smith, ante*, 221.

4. The prohibition of the manufacture, sale, transportation, importation and exportation of intoxicating liquors for beverage purposes, as embodied in the Eighteenth Amendment, is within the power to amend reserved by Article V of the Constitution.

5. That Amendment, by lawful proposal and ratification, has become a part of the Constitution, and must be respected and given effect the same as other provisions of that instrument.

6. The first section of the Amendment—the one embodying the prohibition—is operative throughout the entire territorial limits of the United States, binds all legislative bodies, courts, public officers and individuals within those limits, and of its own force invalidates every

350.　　　　　　　　Conclusions of the Court.

legislative act—whether by Congress, by a state legislature, or by a territorial assembly—which authorizes or sanctions what the section prohibits.

7. The second section of the Amendment—the one declaring "The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation"—does not enable Congress or the several States to defeat or thwart the prohibition, but only to enforce it by appropriate means.

8. The words "concurrent power" in that section do not mean joint power, or require that legislation thereunder by Congress, to be effective, shall be approved or sanctioned by the several States or any of them; nor do they mean that the power to enforce is divided between Congress and the several States along the lines which separate or distinguish foreign and interstate commerce from intrastate affairs.

9. The power confided to Congress by that section, while not exclusive, is territorially coextensive with the prohibition of the first section, embraces manufacture and other intrastate transactions as well as importation, exportation and interstate traffic, and is in no wise dependent on or affected by action or inaction on the part of the several States or any of them.

10. That power may be exerted against the disposal for beverage purposes of liquors manufactured before the Amendment became effective just as it may be against subsequent manufacture for those purposes. In either case it is a constitutional mandate or prohibition that is being enforced.

11. While recognizing that there are limits beyond which Congress cannot go in treating beverages as within its power of enforcement, we think those limits are not transcended by the provision of the Volstead Act (Title II, § 1), wherein liquors containing as much as one-half of one per cent. of alcohol by volume and fit for use for beverage

purposes are treated as within that power. *Jacob Ruppert v. Caffey*, 251 U. S. 264.

Giving effect to these conclusions, we dispose of the cases as follows:

*In Nos. 29 and 30, Original, the bills are dismissed.*

*In No. 794 the decree is reversed.*

*In Nos. 696, 752, 788 and 837 the decrees are affirmed.*


MR. CHIEF JUSTICE WHITE, concurring.

I profoundly regret that in a case of this magnitude, affecting as it does an amendment to the Constitution dealing with the powers and duties of the national and state governments, and intimately concerning the welfare of the whole people, the court has deemed it proper to state only ultimate conclusions without an exposition of the reasoning by which they have been reached.

I appreciate the difficulties which a solution of the cases involves and the solicitude with which the court has approached them, but it seems to my mind that the greater the perplexities the greater the duty devolving upon me to express the reasons which have led me to the conclusion that the Amendment accomplishes and was intended to accomplish the purposes now attributed to it in the propositions concerning that subject which the court has just announced and in which I concur. Primarily, in doing this I notice various contentions made concerning the proper construction of the provisions of the Amendment which I have been unable to accept, in order that by contrast they may add cogency to the statement of the understanding I have of the Amendment.

The Amendment, which is reproduced in the announcement for the court, contains three numbered paragraphs or sections, two of which only need be noticed. The first prohibits "the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into,

or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes." The second is as follows: "Sec. 2. The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation."

1. It is contended that the result of these provisions is to require concurrent action of Congress and the States in enforcing the prohibition of the first section and hence that in the absence of such concurrent action by Congress and the States no enforcing legislation can exist, and therefore until this takes place the prohibition of the first section is a dead letter. But in view of the manifest purpose of the first section to apply and make efficacious the prohibition, and of the second, to deal with the methods of carrying out that purpose, I cannot accept this interpretation, since it would result simply in declaring that the provisions of the second section, avowedly enacted to provide means for carrying out the first, must be so interpreted as practically to nullify the first.

2. It is said, conceding that the concurrent power given to Congress and to the States does not as a prerequisite exact the concurrent action of both, it nevertheless contemplates the possibility of action by Congress and by the States and makes each action effective, but, as under the Constitution the authority of Congress in enforcing the Constitution is paramount, when state legislation and congressional action conflict the state legislation yields to the action of Congress as controlling. But as the power of both Congress and the States in this instance is given by the Constitution in one and the same provision, I again find myself unable to accept the view urged, because it ostensibly accepts the constitutional mandate as to the concurrence of the two powers and proceeds immediately by way of interpretation to destroy it by making one paramount over the other.

3. The proposition is that the concurrent powers con-

ferred upon Congress and the States are not subject to
conflict because their exertion is authorized within differ-
ent areas, that is, by Congress within the field of federal
authority, and by the States within the sphere of state
power, hence leaving the States free within their jurisdic-
tion to determine separately for themselves what, within
reasonable limits, is an intoxicating liquor, and to Con-
gress, the same right within the sphere of its jurisdiction.
·But the unsoundness of this more plausible contention
seems to me at once exposed by directing attention to the
fact that in a case where no state legislation was enacted
there would be no prohibition, thus again frustrating the
first section by a construction affixed to the second. It is
no answer to suggest that a regulation by Congress would
in such event be operative in such a State, since the basis
of the distinction upon which the argument rests is that
the concurrent power conferred upon Congress is confined
to the area of its jurisdiction and therefore is not operative
within a State.

Comprehensively looking at all these contentions, the
confusion and contradiction to which they lead serve in my
judgment to make it certain that it cannot possibly be
that Congress and the States entered into the great and
important business of amending the Constitution in a
matter so vitally concerning all the people solely in order to
·render governmental action impossible, or if possible, to
so define and limit it as to cause it to be productive
of no results and to frustrate the obvious intent and
general purpose contemplated. It is true, indeed, that·
the mere words of the second section tend to these re-
sults, but if they be read in the light of the cardinal rule
which compels a consideration of the context in view of
·the situation and the subject with which the Amendment
dealt and the purpose which it was intended to accom-
plish, the confusion will be seen to be only apparent.

In the first place, it is undisputable, as I have stated,

that the first section imposes a general prohibition which it was the purpose to make universally and uniformly operative and efficacious. In the second place, as the prohibition did not define the intoxicating beverages which it prohibited, in the absence of anything to the contrary, it clearly, from the very fact of its adoption, cast upon Congress the duty, not only of defining the prohibited beverages, but also of enacting such regulations and sanctions as were essential to make it operative when defined. In the third place, when the second section is considered with these truths in mind, it becomes clear that it simply manifests a like purpose to adjust, as far as possible, the exercise of the new powers cast upon Congress by the Amendment to the dual system of government existing under the Constitution. In other words, dealing with the new prohibition created by the Constitution, operating throughout the length and breadth of the United States, without reference to state lines or the distinctions between state and federal power, and contemplating the exercise by Congress of the duty cast upon it to make the prohibition efficacious, it was sought by the second section to unite national and state administrative agencies in giving effect to the Amendment and the legislation of Congress enacted to make it completely operative.

Mark the relation of the text to this view, since the power which it gives to State and Nation is, not to construct or perfect or cause the Amendment to be completely operative, but as already made completely operative, to enforce it. Observe also the words of the grant which confine the concurrent power given to legislation appropriate to the purpose of enforcement.

I take it that if the second section of the article did not exist no one would gainsay that the first section in and of itself granted the power and imposed the duty upon Congress to legislate to the end that by definition and sanction the Amendment would become fully operative. This being

true it would follow, if the contentions under consideration
were sustained, that the second section gave the States the
power to nullify the first section, since a refusal of a State
to define and sanction would again result in no amendment
to be enforced in such refusing State.

Limiting the concurrent power to enforce given by the
second section to the purposes which I have attributed to
it, that is, to the subjects appropriate to execute the
Amendment as defined and sanctioned by Congress, I
assume that it will not be denied that the effect of the
grant of authority was to confer upon both Congress and
the States power to do things which otherwise there
would be no right to do.  This being true, I submit that no
reason exists for saying that a grant of concurrent power to
Congress and the States to give effect to, that is, to carry
out or enforce, the Amendment as defined and sanctioned
by Congress, should be interpreted to deprive Congress of
the power to create, by definition and sanction, an enforce-
able amendment.

Mr. Justice McReynolds, concurring.

I do not dissent from the disposition of these causes as
ordered by the court, but confine my concurrence to that.
It is impossible now to say with fair certainty what con-
struction should be given to the Eighteenth Amendment.
Because of the bewilderment which it creates, a multitude
of questions will inevitably arise and demand solution here.
In the circumstances, I prefer to remain free to consider
these questions when they arrive.

Mr. Justice McKenna, dissenting.

These cases are concerned with the Eighteenth Amend-
ment of the Constitution of the United States, its validity
and construction.  In order to have it, and its scope in
attention, I quote it:

"Section 1.  After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited.

"Sec. 2.  The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation."

The court in applying it has dismissed certain of the bills, reversed the decree in one, and affirmed the decrees in four others.  I am unable to agree with the judgments reversing No. 794 and affirming Nos. 696, 752, 788 and 837.

I am, however, at a loss how, or to what extent, to express the grounds for this action.  The court declares conclusions only, without giving any reasons for them.  The instance may be wise—establishing a precedent now, hereafter wisely to be imitated.  It will undoubtedly decrease the literature of the court if it does not increase lucidity.  However, reasons for the conclusions have been omitted, and my comment upon them may come from a misunderstanding of them, their present import and ultimate purpose and force.

There are, however, clear declarations that the Eighteenth Amendment is part of the Constitution of the United States, made so in observance of the prescribed constitutional procedure, and as part of the Constitution of the United States is to be respected and given effect like other provisions of that instrument.  With these conclusions I agree.

Conclusions 4, 5 and 6, seem to assert the undisputed.  I neither assent to them nor dissent from them except so far as I shall presently express.

Conclusion 7 seems an unnecessary declaration.  It may, however, be considered as supplementary to some other declaration.  My only comment is that I know of no

intimation in the case that § 2, in conferring concurrent power on Congress and the States to enforce the prohibition of the first section, conferred a power to defeat or obstruct prohibition. Of course, the power was conferred as a means to enforce the prohibition and was made concurrent to engage the resources and instrumentalities of the Nation and the States. The power was conferred for use, not for abuse.

Conclusions 8 and 9 as I view them, are complements of each other, and express, with a certain verbal detail, the power of Congress and the States over the liquor traffic, using the word in its comprehensive sense as including the production of liquor, its transportation within the States, its exportation from them, and its importation into them—in a word, give power over the liquor business from producer to consumer and to prescribe the quality of the latter's beverage. Certain determining elements are expressed. It is said that the words "concurrent power" of § 2 do not mean joint power in Congress and the States, nor the approval by the States of congressional legislation, nor its dependency upon state action or inaction.

I cannot confidently measure the force of the declarations or the deductions that are or can be made from them. They seem to be regarded as sufficient to impel the conclusion that the Volstead Act is legal legislation and operative throughout the United States. But are there no opposing considerations, no conditions upon its operation? And what of conflicts?—and there are conflicts, and more there may be, between it and state legislation. The conclusions of the court do not answer the questions and yet they are submitted for decision; and their importance appeals for judgment upon them. It is to be remembered, States are litigants as well as private citizens, the former presenting the rights of the States, the latter seeking protection against the asserted aggression of the act in controversy. And there is opposing state legislation,—why not a deci-

sion upon it? Is it on account of the nature of the actions being civil and in equity, the proper forum being a criminal court investigating a criminal charge? There should be some way to avert the necessity or odium of either.

I cannot pause to enumerate the contentions in the case. Some of them present a question of joint action in Congress and the States, either collectively with all or severally with each. Others assert spheres of the powers, involving no collision, it is said, the powers of Congress and the States being supreme and exclusive within the spheres of their exercise—called by counsel "historical fields of jurisdiction." I submit again, they should have consideration and decision.

The Government has felt and exhibited the necessity of such consideration and decision. It knows the conflicts that exist or impend. It desires to be able to meet them, silence them and bring the repose that will come from a distinct declaration and delimitation of the powers of Congress and the States. The court, however, thinks otherwise, and I pass to the question in the case. It is a simple one, it involves the meaning of a few English words —in what sense they shall be taken, whether in their ordinary sense, or have put upon them an unusual sense.

Recurring to the first section of the Amendment, it will be seen to be a restriction upon state and congressional power, and the deduction from it is that neither the States nor Congress can enact legislation that contravenes its prohibition. And there is no room for controversy as to its requirement. Its prohibition of "intoxicating liquors" "for beverage purposes" is absolute. And, as accessory to that prohibition, there is the further prohibition of their manufacture, sale or transportation within or their importation into or exportation from "the United States." Its prohibition, therefore, is National, and, considered alone, the means of its enforcement might be such as Congress, the agency of National power, might

prescribe. But it does not stand alone. Section 2 associates Congress and the States in power to enforce it. Its words are, "The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation."

What then is meant by the words "concurrent power"? Do they mean united action, or separate and independent action; and, if the actions differ (there is no practical problem unless they differ), shall that of Congress be supreme?

The Government answers that the words mean separate and independent action, and, in case of conflict, that that of Congress is supreme, and asserts besides, that the answer is sustained by historical and legal precedents.[1] I contest the assertions and oppose to them the common usage of our language, and the definitions of our lexicons,

[1] The following is the contention of the Government which I give to accurately represent it: "It is true that the word 'concurrent' has various meanings, according to the connection in which it is used. It may undoubtedly be used to indicate that something is to be accomplished by two or more persons acting together. It is equally true that it means, in other connections, a right which two or more persons, acting separately and apart from each other, may exercise at the same time. It would be idle, however, to go into all the meanings which may attach to this word. In certain connections, it has a well-fixed and established meaning, which is controlling in this case."

And again, "It is to be noted that section 2 does not say that *legislation shall be concurrent*, but that the *concurrent power* to legislate shall exist. The concurrent power of the States and Congress to legislate is nothing new. And its meaning has been too long settled, historically and judicially, to now admit of question. The term has acquired a fixed meaning through its frequent use by this court and eminent statesmen and writers, in referring to the concurrent power of Congress and the States to legislate."

And after citing cases, the Government says: "It will thus be seen that in legal nomenclature the concurrent power of the States and of Congress is clearly and unmistakably defined. It simply means the right of each to act with respect to a particular subject-matter separately and independently."

general and legal.[1]  Some of the definitions assign to the words "concurrent power," action in conjunction, contribution of effort, certainly harmony of action, not antagonism.   Opposing laws are not concurring laws, and to assert the supremacy of one over the other is to assert the exclusiveness of one over the other, not their concomitance.   Such is the result of the Government's contention. It does not satisfy the definitions, or the requirement of § 2—"a concurrent power excludes the idea of a dependent power," Mr. Justice McLean in the *Passenger Cases*, 7 How. 283, 399.

Other definitions assign to the words, "existing or happening at the same time," "concurring together," "coexistent."   These definitions are, as the others are, inconsistent with the Government's contention.   If coexistence of the power of legislation is given to Congress and the States by § 2, it is given to be coexistently exercised.   It is to be remembered that the Eighteenth Amendment was intended to deal with a condition, not a theory, and one demanding something more than exhortation and precept.   The habits of a people were to be changed, large business interests were to be disturbed, and it was considered that the change and disturbance could only be effected by punitive and repressive legislation.   It was naturally thought that legislation enacted by "the Congress and the several States," by its concurrence would better enforce prohibition and avail for its enforcement of the two great divisions of our governmental system,

---

[1] Definitions of the dictionaries are as follows: The Century: "Concurrent: **2. Concurring, or acting in conjunction; agreeing in the same act; contributing to the same event or effect; operating with; coincident. 3. Conjoint; joint; concomitant; coördinate; combined.** That which concurs; a joint or contributory thing."   Webster's first definition is the same as that of the Century.   The second is as follows: "Conjoint; associate; concomitant; existing or happening at the same time."

the Nation and the States, with their influences and instrumentalities.

From my standpoint, the exposition of the case is concluded by the definition of the words of § 2. . There are, however, confirming considerations; and militating considerations are urged. Among the confirming considerations are the cases of *Wedding* v. *Meyler*, 192 U. S. 573, and *Nielsen* v. *Oregon*, 212 U. S. 315, in which " concurrent jurisdiction" was given respectively to Kentucky and Indiana over the Ohio River by the Virginia Compact, and respectively to Washington and Oregon over the Columbia River by act of Congress. And it was decided that the jurisdiction given conferred equality of powers, "legislative, judicial and executive," and that neither State could override the legislation of the other. Other courts have given like definitions. 2 Words and Phrases Judicially Defined, 1391, *et seq.*, Bouvier's Dictionary, vol. 1, p. 579. Analogy of the word "concurrent" in private instruments may also be invoked.

Those cases are examples of the elemental rule of construction that, in the exposition of statutes and constitutions, every word "is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it," and there cannot be imposed upon the words "any recondite meaning or any extraordinary gloss." 1 Story, Const., § 451; *Lake County* v. *Rollins*, 130 U. S. 662. And it is the rule of reason as well as of technicality, that if the words so expounded be "plain and clear, and the sense distinct and perfect arising on them" interpretation has nothing to do. This can be asserted of § 2. Its words express no "double sense," and should be accepted in their single sense. It has not yet been erected into a legal maxim of constitutional construction, that words were made to conceal thoughts. Besides, when we depart from the words, ambiguity comes. There are as many solutions

350.                McKENNA, J., dissenting.

as there are minds considering the section, and out of the
conflict, I had almost said chaos, one despairs of finding an
undisputed meaning.   It may be said that the court,
realizing this, by a declaration of conclusions only has
escaped the expression of antithetical views, considering
it better not to blaze the trails, though it was believed
that they all led to the same destination.

If it be conceded, however, that to the words "concurrent
power " may be ascribed the meaning for which the Gov-
ernment contends, it certainly cannot be asserted that
such is their ordinary meaning, and I might leave § 2, and
the presumptions that support it, to resist the precedents
adduced by the Government.   I go farther, however, and
deny the precedents.   The Federalist and certain cases
are cited as such.   There is ready explanation of both,
and neither supports the Government's contention.   The
dual system of government contemplated by the Union
encountered controversies, fears, and jealousies that had
to be settled or appeased to achieve union, and the Feder-
alist in good and timely sense explained to what extent the
"alienation of State sovereignty" would be necessary
to "National sovereignty," constituted by the "consolida-
tion of the States," and the powers that would be sur-
rendered, and those that would be retained.   And the
explanation composed the controversies and allayed the
fears of the States that their local powers of government
would be displaced by the dominance of a centralized
control.   And this court, after Union had been achieved,
fulfilled the assurances of the explanation and adopted
its distribution of powers, designating them as follows:
(1) Powers that were exclusive in the States—reserved
to them; (2) Powers that were exclusive in Congress, con-
ferred upon it; (3) Powers that were not exclusive in either,
and hence said to be "concurrent."   And it was decided
that, when exercised by Congress, they were supreme—
"The authority of the States then retires" to inaction.

To understand them, it must be especially observed that their emphasis was, as the fundamental principle of the new government was, that it had no powers that were not conferred upon it, and that all other powers were reserved to the States. And this necessarily must not be absent from our minds, whether construing old provisions of the Constitution or amendments to it or laws passed under the amendments.

The Government nevertheless contends that the decisions (they need not be cited) constitute precedents for its construction of § 2 of the Eighteenth Amendment. In other words, the Government contends (or must so contend for its reasoning must bear the test of the generalization) that it was decided that in all cases where the powers of Congress are concurrent with those of the States, they are supreme as incident to concurrence. The contention is not tenable; it overlooks the determining consideration. The powers of Congress were not decided to be supreme because they were concurrent with powers in the States, but because of their source, their source being the Constitution of the United States, as against the source of the powers of the States, their source being the constitutions of the States, the Constitution and laws of the United States being made by Article VI the supreme law of the land, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." *Mc-Culloch* v. *Maryland*, 4 Wheat. 316, 426.

This has example in other powers of sovereignty that the States and Congress possess. In *McCulloch* v. *Maryland*, at pages 425, 430, Chief Justice Marshall said that the power of taxation retained by the States was not abridged by the granting of a similar power to the Government of the Union, and that it was to be concurrently exercised, and these truths, it was added, had never been denied, and that there was no "clashing sovereignty" from incompatibility of right. And necessarily; a con-

currence of power in the States and Congress excludes the idea of supremacy in either. Therefore, neither principle nor precedent sustains the contention that § 2, by giving concurrent power to Congress and the States, gave Congress supreme power over the States. I repeat the declaration of Mr. Justice McLean: "A concurrent power excludes the idea of a dependent power."

It is, however, suggested (not by the Government) that if Congress is not supreme upon the considerations urged by the Government, it is made supreme by Article VI of the Constitution. The Article is not applicable. It is not a declaration of the supremacy of one provision of the Constitution or laws of the United States over another, but of the supremacy of the Constitution and laws of the United States over the constitutions and laws of the States. *Gibbons* v. *Ogden*, 9 Wheat. 1, 209, 211; 2 Story, Const., 5th ed., § 1838, *et seq.*

The Eighteenth Amendment is part of the Constitution of the United States, therefore of as high sanction as Article VI. There seems to be a denial of this, based on Article V. That Article provides that the amendments proposed by either of the ways there expressed "shall be valid to all Intents and Purposes, as Part of this Constitution." Some undefinable power is attributed to this in connection with Article VI, as if Article V limits in some way, or defeats, an amendment to the Constitution inconsistent with a previously existing provision. Of course, the immediate answer is that an amendment is made to change a previously existing provision. What other purpose could an amendment have? And it would be nullified by the mythical power attributed to Article V, either alone or in conjunction with Article VI. A contention that ascribes such power to those articles is untenable. The Eighteenth Amendment is part of the Constitution and as potent as any other part of it. Section 2, therefore, is a new provision of power, power to the

States as well as to Congress, and it is a contradiction to say that a power constitutionally concurrent in Congress and the States, in some way becomes constitutionally subordinate in the States to Congress.

If it be said that the States got no power over prohibition that they did not have before, it cannot be said that the power already possessed was not preserved to them by the Amendment, notwithstanding the policy of prohibition was made national; and besides, there was a gift of power to Congress that it did not have before, a gift of a right to be exercised within state lines, but with the limitation or condition that the powers of the States should remain with the States and be participated in by Congress only in concurrence with the States, and thereby preserved from abuse by either, or exercise to the detriment of prohibition. There was, however, a power given to the States, a power over importations. This power was subject to concurrence with Congress and had the same safeguards.

This construction of § 2 is enforced by other considerations. If the supremacy of Congress had been intended, it would have been directly declared as in the Thirteenth, Fourteenth and Fifteenth Amendments. And such was the condition when the Amendment left the Senate. The precedent of preceding amendments was followed, there was a single declaration of jurisdiction in Congress.

Section 2 was amended in the House upon recommendation of the Judiciary Committee, and the provision giving concurrent power to Congress and to the States was necessarily estimated and intended to be additive of something. The Government's contention makes it practically an addition of nothing but words, in fact denuding it of function, making it a gift of impotence, not one of power to be exercised independently of Congress or concurrently with Congress, or, indeed, at all. Of this there can be no contradiction, for what power is assigned to the States to legislate if the legislation be immediately

superseded—indeed, as this case shows, be possibly fore-
stalled and precluded by the power exercised in the
Volstead Act?    And meaningless is the difference the
Government suggests between concurrent power and con-
current legislation.   A power is given to be exercised, and
we are cast into helpless and groping bewilderment in
trying to think of it apart from its exercise or the effect of
its exercise.   The addition to § 2 was a conscious adapta-
tion of means to the purpose.    It changed the relation
between the States and the National Government.    The
lines of exclusive power in one or the other were removed,
and equality and community of powers substituted.

There is a suggestion, not made by the Government,
though assisting its contention, that § 2 was a gift of
equal power to Congress and to the States, not, however,
to be concurrently exercised, but to be separately exer-
cised; conferred and to be exercised, is the suggestion, to
guard against neglect in either Congress or the States,
the inactivity of the one being supplied by the activity
of the other.   But here again we encounter the word "con-
current" and its inexorable requirement of coincident or
united action, not alternative or emergency action to safe-
guard against the delinquency of Congress or the States.
If, however, such neglect was to be apprehended, it is
strange that the framers of § 2, with the whole vocabu-
lary of the language to draw upon, selected words that
expressed the opposite of what the framers meant.   In
other words, expressed concurrent action instead of sub-
stitute action.   I cannot assent.   I believe they meant
what they said and that they must be taken at their word.

The Government with some consciousness that its
contention requires indulgence or excuse, at any rate in
recognition of the insufficiency of its contention to satisfy
the words of § 2, makes some concessions to the States.
They are, however, not very tangible to measurement.
They seem to yield a power of legislation to the States

and a power of jurisdiction to their courts, but, almost at the very instant of concession, the power and jurisdiction are declared to be without effect.

I am not, therefore, disposed to regard the concessions seriously. They confuse; "make no light; but rather darkness visible." Of what use is a concession of power to the States to enact laws which cannot be enforced? Of what use a concession of jurisdiction to the courts of the States when their judgments cannot be executed, indeed the very law upon which it is exercised may be declared void in an antagonistic jurisdiction exerted in execution of an antagonistic power? [1] And equally worthless is the analogy that the Government assays between the power of the National Government and the power of the States to criminally punish violations of their respective sovereignties, as for instance in counterfeiting cases. In such cases the exercises of sovereignty are not in antagonism. Each is inherently possessed and independently exercised, and can be enforced no matter what the other sovereignty may do or abstain from doing. On the other hand, under the Government's construction of § 2, the legislation of Congress is supreme and exclusive. Whatever the States may do is abortive of effect.

The Government, seeking relief from the perturbation of mind and opinions produced by departure from the words of § 2, suggests a modification of its contention that in case of conflict between state legislation and congres-

---

[1] The Government feels the inconsistency of its concessions and recessions. It asserts at one instant that the legislation of the States may be enforced in their courts, but in the next instant asserts that the conviction or acquittal of an offender there will not bar his prosecution in the federal courts for the same act as a violation of the federal law. From this situation the Government hopes that there will be rescue by giving the Eighteenth Amendment "such a meaning that a prosecution in the courts of one government may be held to bar a prosecution for the same offense in the courts of the other." The Government considers, however, the question is not now presented.

sional legislation that of Congress would prevail, by intimating that, if state legislation be more drastic than congressional legislation, it might prevail; and, in support of the suggestion, urges that § 1 is a command to prohibition, and that the purpose of § 2 is to enforce the command, and whatever legislation is the most prohibitive subserves best the command, displaces less restrictive legislation and becomes paramount. If a State, therefore, should define an intoxicating beverage to be one that has less than one-half of one per cent. of alcohol, it would supersede the Volstead Act, and a State might even keep its legislation supreme by forestalling congressional retaliation by prohibiting all artificial beverages of themselves innocuous, the prohibition being accessory to the main purpose of power,—adducing *Purity Extract Co.* v. *Lynch*, 226 U. S. 192. *Jacob Ruppert* v. *Caffey*, 251 U. S. 264. Of course this concession to the more drastic legislation destroys all that is urged for congressional supremacy; for necessarily supremacy cannot be transferred from the States to Congress or from Congress to the States as the quantity of alcohol may vary in the prohibited beverage. Section 2 is not quite so flexible to management. I may say, however, that one of the conclusions of the court has limited the range of retaliations. It recognizes "that there are limits beyond which Congress cannot go in treating beverages as within its power of enforcement" and declares that "those limits are not transcended by the provisions of the Volstead Act." Of course, necessarily, the same limitations apply to the power of the States as well.

From these premises the deduction seems inevitable that there must be united action between the States and Congress, or, at any rate, concordant and harmonious action; and will not such action promote better the purpose of the Amendment—will it not bring to the enforcement of prohibition the power of the States and the power of

Congress, make all the instrumentalities of the States, its courts and officers, agencies of the enforcement, as well as the instrumentalities of the United States, its courts and officers, agencies of the enforcement? Will it not bring to the States as well, or preserve to them, a partial autonomy, satisfying, if you will, their prejudices, or better say, their predilections?—and it is not too much to say that our dual system of government is based upon them. And this predilection for self-government the Eighteenth Amendment regards and respects, and by doing so, sacrifices nothing of the policy of prohibition.

It is, however, urged that to require such concurrence is to practically nullify the prohibition of the Amendment, for without legislation its prohibition would be ineffectual; and that it is impossible to secure the concurrence of Congress and the States in legislation. I cannot assent to the propositions. The conviction of the evils of intemperance—the eager and ardent sentiment that impelled the Amendment,—will impel its execution through Congress and the States. It may not be in such legislation as the Volstead Act with its $\frac{1}{2}$ of $1\%$ of alcohol, or in such legislation as some of the States have enacted with their $2.75\%$ of alcohol, but it will be in a law that will be prohibitive of intoxicating liquor for beverage purposes. It may require a little time to achieve, it may require some adjustments, but of its ultimate achievement there can be no doubt. However, whatever the difficulties of achievement, in view of the requirement of § 2, it may be answered as this court answered in *Wedding* v. *Meyler, supra*, "The conveniences and inconveniences of concurrent jurisdiction both are obvious and do not need to be stated. We have nothing to do with them when the law-making power has spoken."

I am, I think, therefore, justified in my dissent. I am alone in the grounds of it, but, in relief of the solitude of my position, I invoke the coincidence of my views with

350. CLARKE, J., dissenting.

those entertained by the minority membership of the Judiciary Committee of the House of Representatives, and expressed in its report upon the Volstead Act.

MR. JUSTICE CLARKE, dissenting.

I concur in the first seven paragraphs and in the tenth paragraph of the announced "conclusions" of the court, but I dissent from the remaining three paragraphs.

The eighth, ninth and eleventh paragraphs, taken together, in effect, declare the Volstead Act to be the supreme law of the land,—paramount to any state law with which it may conflict in any respect.

Such a result, in my judgment, can be arrived at only by reading out of the second section of the Eighteenth Amendment to the Constitution the word "concurrent," as it is used in the grant to Congress and the several States of "concurrent power to enforce this article by appropriate legislation." This important word, which the record of Congress shows was introduced, with utmost deliberation, to give accurate expression to a very definite purpose, can be read out of the Constitution only by violating the sound and wise rule of constitutional construction early announced and often applied by this court,—that in expounding the Constitution of the United States no word in it can be rejected as superfluous or unmeaning, but effect must be given to every word to the extent that this is reasonably possible.

This rule was first announced in 1824 in *Gibbons* v. *Ogden*, 9 Wheat. 1; it was applied with emphasis in 1840 in *Holmes* v. *Jennison*, 14 Pet. 540, 570; and in the recent case of *Knowlton* v. *Moore*, 178 U. S. 41, it is referred to as an elementary canon of constitutional construction.

The authoritative dictionaries, general and law, and the decided cases, agree, that "concurrent" means "joint and equal authority", "running together, having the same

authority," and therefore the grant of concurrent power to the Congress and the States should give to each equal,—the same,—authority to enforce the Amendment by appropriate legislation. But the conclusions of the court from which I dissent, by rendering the Volstead Act of Congress paramount to state laws, necessarily deprive the States of all power to enact legislation in conflict with it, and construe the Amendment precisely as if the word "concurrent" were not in it. The power of Congress is rendered as supreme as if the grant to enforce the Amendment had been to it alone, as it is in the Thirteenth, Fourteenth and Fifteenth Amendments and as it was in one proposed form of the Eighteenth Amendment which was rejected by Congress. Cong. Rec., July 30, 1917, p. 5548, and December 17, 1917, p. 469.

Such a construction should not be given the Amendment if it can reasonably be avoided, as it very clearly may be, I think, with a resultant giving of a large and beneficent effect to the grant, as it is written. Giving to the word "concurrent" its usual and authoritative meaning, would result in congressional legislation under this grant of power being effective within the boundaries of any State only when concurred in by action of Congress and of such State, which, however, could readily be accomplished by the approval by either of the legislation of the other or by the adoption of identical legislation by both. Such legislation would be concurrent in fact and in law and could be enforced by the courts and officers of either the Nation or the State, thereby insuring a more general and satisfactory observance of it than could possibly be obtained by the federal authorities alone. It would, to a great extent, relieve Congress of the burden and the general government of the odium to be derived from the antagonism which would certainly spring from enforcing, within States, federal laws which must touch the daily life of the people very intimately and often very irritatingly.

Such coöperation in legislation is not unfamiliar to our Constitution or in our practical experience.

By § 10 of Art. I of the Constitution of the United States the States are deprived of power to do many things without the consent of Congress, and that consent has frequently been given, especially to contracts and agreements between States, which without it would be unconstitutional and void. The Wilson Act of 1890, the Webb-Kenyon Act of 1913, and the Reed Amendment of 1917 are familiar examples of coöperative legislation on the subject of intoxicating liquors. Other instances could readily be supplied. When to this we add that the Volstead Act is obviously in very large part a compilation from the prohibition codes of various States and is supposed to contain what is best in each of them, there is every reason to believe that, if concurrent legislation were insisted upon, the act would be promptly approved by the legislatures of many of the States and would thereby become the concurrent law of the State and Nation throughout a large part of the Union.

Under this construction, which I think should be given the Amendment, there would be large scope also for its operation even in States which might refuse to concur in congressional legislation for its enforcement. In my judgment, the law in such a State would be as if no special grant of concurrent power for the enforcement of the first section had been made in the second section, but, nevertheless, the first section, prohibiting the manufacture, sale, transportation, importation or exportation, of intoxicating liquors for beverage purposes, would be the supreme law of the land within the non-concurring States and they would be powerless to license, tax, or otherwise recognize as lawful anything violating that section, so that any state law in form attempting such recognition would be unconstitutional and void. Congress would have full power under the interstate commerce clause,

and it would be its duty, to prevent the movement of such liquor for beverage purposes into or out of such a State and the plenary police power over the subject, so firmly established in the States before the Eighteenth Amendment was adopted, would continue for use in the restricted field which the first section of the Amendment leaves unoccupied,—and the presumption must always be indulged that a State will observe and not defy the requirements of the National Constitution.

Doubtless such a construction as I am proposing would not satisfy the views of extreme advocates of prohibition or of its opponents, but in my judgment it is required by the salutary rule of constitutional construction referred to, the importance of which cannot be overstated. It is intended to prevent courts from re-writing the Constitution in a form in which judges think it should have been written instead of giving effect to the language actually used in it; and very certainly departures from it will return to plague the authors of them. It does not require the eye of a seer to see contention at the bar of this court against liberal, paramount, congressional definition of intoxicating liquors as strenuous and determined as that which we have witnessed over the strict definition of the Volstead Act.

With respect to the 11th conclusion of the court, it is enough to say that it approves as valid a definition of liquor as intoxicating which is expressly admitted not to be intoxicating in each of the cases in which it is considered. This is deemed warranted, I suppose, as legislation appropriate to the enforcement of the first section, and precedent is found for it in prohibition legislation by States. But I cannot agree that the prohibition of the manufacture, sale, etc., of intoxicating liquors in the first section of the Eighteenth Amendment gives that plenary power over the subject which the legislatures of the States derive from the people or which may be derived from the war powers

of the Constitution.  Believing, as I do, that the scope of
the first section cannot constitutionally be enlarged by
the language contained in the second section, I dissent
from this conclusion of the court.

In the *Slaughter-House* [16 Wall. 36], and other cases,
this court was urged to give a construction to the Four-
teenth Amendment which would have radically changed
the whole constitutional theory of the relations of our
state and federal governments by transferring to the
general government that police power, through the exer-
cise of which the people of the various States theretofore
regulated their local affairs in conformity with the widely
differing standards of life, of conduct and of duty which
must necessarily prevail in a country of so great extent
as ours, with its varieties of climate, of industry and of
habits of the people.  But this court, resisting the pressure
of the passing hour, maintained the integrity of state
control over local affairs to the extent that it had not been
deliberately and clearly surrendered to the general govern-
ment, in a number of decisions which came to command
the confidence of the generation active when they were
rendered and which have been regarded by our suc-
ceeding generation as sound and wise and highly fortunate
for our country.

The cases now before us seem to me to again present
questions of like character to, and of not less importance
than, those which were presented in those great cases,
and I regret profoundly that I cannot share in the dis-
position which the majority of my associates think should
be made of them.